Commonwealth *v.* Duffy, Appellant.

162

Argued December 4, 1974. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, and SPAETH, JJ. (VAN DER VOORT, J., absent).

*John Rogers Carroll,* with him *Robert E. Gabriel,* for appellant.

*Robert S. Gawthrop, III,* Assistant District Attorney, with him *F. Ned Hand,* Assistant District Attorney, and *William H. Lamb,* District Attorney, for Commonwealth, appellee.

OPINION BY SPAETH, J., December 22, 1975:

Appellant was tried by a jury on charges of receiving stolen property, conspiracy to do an unlawful act, compounding a crime, and being a principal in the second degree, accessory, aider and abettor. He was found guilty of conspiracy, but was acquitted of the other charges. Post-trial motions in arrest of judgment and for a new trial were denied, and sentence was imposed. This appeal, which challenges only the denial of the motion for a new trial, followed.

I

Appellant's first contention is that the trial judge erred in permitting the Commonwealth, on a plea of surprise, to cross-examine and impeach its principal witness.

The charges against appellant arose from events said to have occurred on April 7, 1972. In the late afternoon of that day, appellant, an attorney, was in his office in West Chester, with John Foley, an attorney with whom he shared office space, and Jay Beachem, a client. In the presence of Foley and Beachem, appellant received a telephone call from one Richard Mitchell, also one of appellant's clients, who had just been arrested at the Sears, Roebuck store in St. Davids for attempting to make purchases with a stolen credit card. When Mitchell apparently said that he was calling on a police telephone, appellant asked him to hang up and to call back collect on a pay telephone. A minute or two later appellant's telephone rang again, and appellant answered it. Foley and Beachem overheard appellant's side of the conversation.

The Commonwealth's theory was that in the conversation, through a system of coded question and answers, Mitchell asked appellant, and appellant agreed, to conceal a stolen car, by moving it from the Sears parking lot to another location, and to dispose of any evidence that might link Mitchell to the car. In support of this theory the Commonwealth called Beachem, who testified that

he, appellant, and one Frederick Paup[1] did move a car from the Sears lot, wiped fingerprints from its interior, and removed checkbooks and credit cards, a sawed-off shotgun, and burglary tools. Beachem also testified that the ignition of the car was inoperative, so that the car apparently had to be started with a screwdriver. The police officer who later examined the car testified that the ignition had been punched out. Other witnesses testified that the car, the checkbooks, and the credit cards had been stolen.

As regards appellant's knowledge, this evidence was circumstantial. The Commonwealth therefore attempted to prove by direct evidence that appellant knew the car was stolen, but it was frustrated by the testimony of its own witnesses. Mitchell testified that he did not know at the time of his telephone conversation with appellant that the car was stolen. When asked whether he had told appellant the car was stolen, he replied, "I don't know if I did or not." When asked whether he knew the contents of the car were stolen, and whether he had asked appellant to move the car, he replied, "I could have." Beachem, upon cross-examination, specifically repudiated a statement he had given to the police that appellant had told him and Foley that Mitchell's car was "hot" and contained stolen items.

The Commonwealth then called Foley (who it will be recalled, had, along with Beachem, overheard appellant's side of the telephone conversation with Mitchell). Foley had given two oral statements to members of the district attorney's staff.[2] In these he had said that appellant had specifically asked during the telephone conversation whether the car was stolen; that later appellant had told him and Beachem that the car was stolen; and that

1. Paup was appellant's co-defendant at trial. He was acquitted of all charges.

2. He had also given a written statement; the significance of this will be discussed later.

on the next Monday an unfamiliar shotgun had appeared in appellant's office. However, when the assistant district attorney asked Foley to state his recollection of the events of April 7, 1972, Foley's answers contained no reference whatsoever either to any conversation regarding the ownership of the car or to the appearance of an unfamiliar shotgun. When further non-leading questions also failed to elicit the testimony that the statements suggested would be given, the assistant district attorney turned Foley over to defense counsel for cross-examination.

Upon cross-examination, defense counsel pursued the same avenues of inquiry, eliciting the following information:

"Q. Did you in the conversation with Mr. Mitchell, or any later conversation of Mr. Duffy that day, hear any reference to the fact that the car involved was stolen or hot, as they say?

A. No.

Q. You mentioned that there were shotguns in the office?

A. Yes.

Q. As of April '72, how long have they been there?

A. I never really, you know, looked at them and their description. I just know from time to time we had items belonging to clients in the office, and I know one had been there in particular for quite a long time. That's really the only one I know of for sure.

Q. Did you notice on the Monday following April seven anything unusual, either about that gun or any other gun?

A. No."

Upon redirect examination, the assistant district attorney said:

"I heard you, as I understand your answer to Mr. Carroll, you said you do not recall—you said that

there was nothing said on the phone as to the car being stolen. Did you not tell the State Police—"

At this point, defense counsel objected. The assistant district attorney pleaded surprise. The plea was granted, and the assistant district attorney was permitted to prove the contents of the two prior oral statements Foley had given to members of the district attorney's staff,[3] and to cross-examine Foley about them. When Foley nevertheless stuck to his trial testimony, the trial judge instructed the jury that the statements were not to be used as substantive evidence but only for the purpose of assessing Foley's credibility. *See Commonwealth v. Thomas,* 459 Pa. 371, 329 A.2d 277, 283 (1974).

"It is well settled that when one's witness turns hostile by telling a different version on the witness stand than he told the calling party prior thereto, the latter may plead surprise and request leave to cross-examine the witness and impeach him by his prior inconsistent statement. . . . Further, the fundamental rule in this jurisdiction is that it is within the sound discretion of the trial court to decide whether counsel may exercise the right to cross-examine the hostile witness." *Commonwealth v. London,* 461 Pa. 566, 337 A.2d 549, 553 (1975). In exercising its discretion, the trial court is to apply a four-part test:

". . . First, before counsel may cross-examine his own witness on a plea of surprise the testimony given by the witness must be unexpected. . . .

"Secondly, the testimony of the witness must be contradictory to statements the witness had made earlier. . . .

"Thirdly, the testimony must be hurtful or injurious to the party calling the witness and beneficial to the opposing side. . . .

---

3. The statements were proved by calling the persons to whom they had been given: the district attorney and two State troopers, as to the first statement, and an assistant district attorney, as to the second.

"Fourthly, the scope of the cross-examination may not be excessive. . . . The end sought to be achieved by permitting cross-examination of a witness by the party calling him is to allow an opportunity to dispute those unexpected adverse statements made by that witness by showing to the jury that he stated otherwise on a prior occasion. The prior statement is not admitted as substantive testimony, but for the limited purpose of establishing the inconsistency. . . ." *Commonwealth v. Thomas,* 459 Pa. 371, 379-380, 329 A.2d 277, 281 (1974).

Furthermore, our Supreme Court has stated that the use of leading questions upon redirect of a Commonwealth witness—even without a plea of surprise—may be within the proper discretion of the trial court, particularly where, as here, the Commonwealth witness is an associate of the defendant and reluctant to testify against him. *Commonwealth v. Settles,* 442 Pa. 159, 275 A.2d 61 (1971). *Accord: Commonwealth v. Bruno,* 316 Pa. 394, 175 A. 518 (1934).

In the present case, the four requirements of the *Thomas* test were met. First, unexpected testimony occurred when upon cross-examination Foley testified that he had not heard appellant make any reference to the car as being stolen, and when he denied seeing any unfamiliar shotgun in appellant's office.[4] Second, this testimony was in direct contradiction to the two prior statements made to members of the district attorney's staff. Third, it was harmful to the Commonwealth, for if believed by

---

4. Although Foley's testimony on direct examination was also unexpected in that Foley omitted saying what he had said in his prior statements, that omission did not form the proper basis for a plea of surprise because it was merely disappointing. "Surprise, in its legal connotation, does not embrace disappointment or a feeling of frustration on the part of the one seeking to have a witness testify otherwise than he has indicated he will do." *Commonwealth v. Turner,* 389 Pa. 239, 253-4, 133 A.2d 187, 193 (1957).

the jury, it tended to negate the Commonwealth's circumstantial evidence that appellant knew the car was stolen,[5] and that he had participated in taking items out of the car. And fourth, the scope of the Commonwealth's cross-examination was proper. Although virtually the entire contents of Foley's two prior oral statements were introduced into evidence, these contents, with one harmless exception, dealt directly with the disputed adverse testimony or with peripheral undisputed details. The one exception concerned a statement allegedly made by appellant to Beachem after the telephone conversation. After having been granted permission to cross-examine Foley, the assistant district attorney asked:

"Q. Did he also say to Jay [Beachem] there is a job I need you for?

"A. Not that I recall.

"Q. Your answer to that is no?

"A. Yes."

No adverse testimony regarding this particular alleged statement by appellant to Beachem had occurred before the plea of surprise. However, we are satisfied that there was no prejudicial error; Beachem had already testified that he had in fact participated with appellant in the "job," so that proof of the presence or absence of a request by appellant that Beachem participate was not critical to the case. *Commonwealth v. London, supra* at 576, 337 A.2d at 554.

Appellant argues that the Commonwealth had no right to rely on Foley's two prior oral statements since it had in its possession a written statement by Foley, in which, according to appellant, Foley had repudiated the oral statements. This argument is not persuasive for three reasons. First, the written statement did not repudiate

---

5. The Act of June 24, 1939, P.L. 872, §817, Act of May 21, 1943, P.L. 306, §1, 18 P.S. §4817, under which appellant was charged, defines knowledge as an element of the crime of receiving stolen goods.

the oral statements; it simply omitted the portions at issue. Second, one of the oral statements occurred *after* the written statement, thus causing the Commonwealth to rely on it rather than on the earlier written one.[6] Third, although Foley testified that he had repudiated the first oral statement, James Porter, an assistant district attorney, testified that Foley had instead verified the statement, and it is evident that the trial judge believed Porter, which was within his discretion.

## II

Appellant's second contention is that the trial judge improperly limited appellant's cross-examination and impeachment of the Commonwealth's principal witness, Jay Beachem, in several respects, which will be considered separately.

## A

Appellant first contends that he was not permitted to cross-examine Beachem regarding his address.

The right of an accused in a criminal case to confront the witnesses against him includes the right to cross-examine a witness as to his home address and place of employment. *Smith v. Illinois,* 390 U.S. 129 (1968); *Alford v. United States,* 282 U.S. 687 (1931). The purpose of such cross-examination is to "place the witness in his proper setting and put the weight of this testimony and his credibility to a test, without which the jury cannot fairly appraise them. . . ." *Alford v. United States, supra* at 692. We have recently held, however, in *Commonwealth v. Vorhauer,* 232 Pa. Superior Ct. 84, 92, 331

---

6. The first oral statement was in an interview on July 14, 1972, with the district attorney and two State troopers. The written statement was dated September 7, 1972. The second oral statement was on or about November 13, 1972, when Foley was interviewed by the assistant district attorney assigned to try the case, Robert Gawthrop, in the presence of another assistant district attorney, James Porter.

A.2d 815, 819 (1974), that where there is a threat to the personal safety of the witness, the right to cross-examine him as to his home address and place of employment may be limited.

Here, Beachem testified on direct examination that he was originally from West Chester, but that at the time of the trial he was employed by the firm of Jordan and Mathas in Seattle, Washington, and had been employed by that firm for almost a year. When asked by defense counsel on cross-examination where in Seattle he lived, he said he preferred not to give his address. When the court began to instruct him to answer the question, the assistant district attorney objected and requested that he not be directed to do so "in his personal interest." The court sustained the objection. Defense counsel then successfully proceeded to cross-examine on past employment, past criminal record, history of admissions to mental hospitals, and numerous past addresses—including motels where Beachem had stayed at the expense of the Chester County District Attorney's office. On redirect Beachem testified that when he was in the motels, he was in protective custody resulting from a threat by appellant to his life; he said appellant asked members of the Pagan motorcycle gang[7] to "get" him, and that they responded that they would.[8]

---

7. Testimony throughout the trial established that appellant had a professional and social association with the Pagan motorcycle gang. Robert Miller, a part-time bartender at a West Chester tavern, testified that appellant spent lengthy periods drinking with Pagans on numerous occasions. Appellant himself testified that he was the "club attorney" and that he served as best man at the wedding of his co-defendant, who was a Pagan.

8. Miller later contradicted Beachem's testimony that Miller was a witness to this threat. He did testify, however, that on one occasion he had to escort Beachem out of the tavern "for his own good." Beachem (a black man) was in the bar with a white woman when a group of Pagans arrived. Miller explained: ". . . I also know that [the Pagans] dislike any kind of mixed relations be-

Given the testimony regarding appellant's association with the Pagans, the Pagans' apparent hostility toward Beachem, and the alleged threat on Beachem's life, the trial judge did not abuse his discretion in excusing Beachem from giving his present address.[9]

Furthermore, even without Beachem's present Seattle address, the purpose of the *Alford-Smith* rule was fulfilled. The witness was put in his proper setting by the other address testimony, which included information regarding residences provided by the prosecution. The jury was therefore aware of the possible bias of the witness

---

tween white guys and—white people and black guys, or whatever— . . ." and "there was some sort of friction between the black people and the Pagan Motorcycle Gang. . . ." He also testified that on that occasion appellant was not present and no verbal treats were uttered, but there was no testimony that this was the same evening that Beachem was referring to. Miller also testified that appellant's connection with the Pagans could have been on his mind when he escorted Beachem out of the tavern. The assistant district attorney asked:

"Q. Isn't it a fact, sir, that another one of the reasons that might just have been in your head that evening, when you suggested to Mr. Beachem that he get out of the Barrister posthaste, another one of the reasons why you thought it would be for his own good to get out of there, you knew he was involved in this prosecution, and you knew that Mr. Duffy and the Pagans were involved?"

After an objection was overruled, Miller responded: "I was aware and I—that could have been the underlying reason why."

9. *Commonwealth v. Vorhauer, supra,* at 92, 331 A.2d 815, 820, quotes Justice WHITE's concurring opinion in *Smith v. Illinois, supra* at 134, regarding the procedure to be followed in this situation:

". . . the State or the witness should at the very least come forward with some showing of why the witness must be excused from answering the question. The trial judge can then ascertain the interest of the defendant in the answer and exercise an informed discretion in making his ruling. . . ."

Although the trial judge here did not require such a showing at the time of the question, the other testimony supplied it.

and, with the additional information on his criminal and psychiatric history, was able to judge his credibility. Nor was the defense deprived of investigatory leads, *Smith v. Illinois, supra* at 131, since none of the events related to the trial occurred in the Seattle area.

## B

Appellant next contends that the trial judge improperly limited his cross-examination of Beachem regarding his mental condition and use of drugs.

Mere mental derangement on some matter not connected with the subject of the litigation and not affecting the testimonial ability of the witness is not even to be considered by the jury in determining the witness' credibility. *Commonwealth v. Kosh,* 305 Pa. 146, 157 A. 479 (1931). However, questions pertaining to the use of drugs or alcohol are proper when asked "for the purpose of attacking the credibility of the witness by showing that at the time of the event to which he testified his powers of observation and memory were impaired, so that his recollection and account of the experience might be inaccurate." *Commonwealth v. Dreibelbis,* 217 Pa. Superior Ct. 257, 260-261, 269 A.2d 387, 389 (1970). The same is true for questions regarding mental illness at the time of the event. Thus we have held that treatment in a mental hospital within seven months of the date of a trial is enough to raise a question for the jury as to the effect of the mental disorder on the witness's credibility. *Commonwealth v. Chuck,* 227 Pa. Superior Ct. 612, 323 A.2d 123 (1974); *Commonwealth v. Towber,* 190 Pa. Superior Ct. 93, 152 A.2d 917 (1959).

Appellant's contention on this issue, however, is not supported by the record. Appellant was permitted to question Beachem about voluntary and involuntary admissions to hospitals for mental conditions from a time at least four months before the commission of the crime until at least one month after the crime. He was also

permitted to ask Beachem about his use of drugs during those same times, and from the time of his statement to the police in June of 1972 until the time of the preliminary hearing in September of 1972, and at the time of the trial. The questions that were not permitted by the trial judge concerned times that were unrelated to the litigation and did not affect the testimonial ability of the witness. *Commonwealth v. Kosh, supra.*

## C

Appellant also contends that the trial judge improperly limited impeachment of Beachem by restricting the testimony of other witnesses.[10]

Appellant first contends that the testimony of Joseph Bozzell, John Foley, and Bridget Duffy was improperly limited with respect to Beachem's use of drugs. However, the questions that the trial court prohibited were questions regarding Beachem's use of drugs in general; they were not related to any event as to which Beachem testified. Such questions were properly excluded. *Commonwealth v. Dreibelbis, supra.* Moreover, Bozzell and Foley were both permitted to testify that they had seen Beachem use drugs and that Beachem had told them that the state police had supplied him with marijuana in payment for his testimony in this case.

Appellant next contends that the trial judge improperly limited the testimony of John Foley "as to Beachem's statements concerning his lying about the defendant." The argument is frivolous. When Foley was called as a

10. Six contentions regarding various witnesses are compressed into four sentences in one part of the Argument section of appellant's brief. No law is discussed or cited in regard to any of the contentions; neither is there any reference to the pages where the disputed testimony appears in the one thousand and four pages of the notes of testimony. Such presentation does not conform with Rule 45 of the Rules of the Superior Court; we have nevertheless considered the contentions.

defense witness he was permitted to testify in great detail and almost without interruption as to conversations he had had with Beachem, in which Beachem said he had lied to the police regarding appellant.

Appellant finally contends in regard to Beachem that the trial judge "improperly limited questions as to Beachem's bad reputation and failed properly to treat him as an accomplice in the crime." However, no specific mention of these alleged errors appeared in appellant's post-trial motion for a new trial. Issues not preserved at each stage of review by a specific allegation of error are waived and cannot be raised in an appeal to this court. *Commonwealth v. Bronaugh,* 459 Pa. 634, 331 A.2d 171 (1975).

## III

Appellant argues, although only in a footnote, that the court erred in allowing the Commonwealth to ask Bozzell why, after Beachem allegedly told him that the information he had given to the police regarding appellant was false, he had not reported that misconduct to the police. Appellant cites *United States v. Young,* 463 F.2d 934 (D.C. Cir. 1972), where the court stated that it was improper for the prosecutor to examine a witness, who could have provided an alibi defense for the defendant, on his failure to call the police. The court there held, however, that the error was not so prejudicial as to require reversal[11] because the witness gave a satisfactory explanation of his omission, and because

> ". . . in all likelihood the jury took it for a strained argument by the prosecution. As Judge DANAHER has commented, prosecutors often overtry their cases, and in their zeal say things that are regrettable but are not significant in terms of influencing a convic-

---

11. The court also noted that there was no objection to the question by defense counsel. Here appellant did object, but that factor alone does not compel a different result.

tion. *Turner v. United States*, 135 U.S. App. D.C. 59, 62, 416 F.2d 815, 818 (1969)." *United States v. Young, supra* at 938.

In the present case, Bozzell did more than satisfactorily answer the question, he actually shifted the blame to the prosecutor:

"Q.   In point of fact, sir, when you get down to it, you haven't bothered to tell anybody in authority about this testimony you come here today, or yesterday, until this trial, right now, isn't that correct? [Defense objection overruled.] . . .

A.   Sir, I tried to tell you.

Q.   And my question, first, isn't that correct?

A.   No. I sat outside your office and tried to tell you. You passed me the last time.

Q.   When was that?

A.   The last time this case came to trial, you walked passed [sic] me a million times. You had me sitting there for two days. . . ."

Moreover, this Court stated in *Commonwealth v. Downer*, 159 Pa. Superior Ct. 626, 629-30, 49 A.2d 516, 519 (1946) : "In criminal trials the defendant's witnesses are usually asked why they did not report what they purported to hear or see to the police officers. Such cross-examination is proper and the admissibility does not depend upon any *duty* to speak or report to the police officers; but the fact that the witness did not, may, in some degree, shed light on the believability of the testimony. . . ." [Emphasis in original.] The facts of this case do not persuade us to retract *Downer*.

## IV

Appellant's last contention is that the trial judge erred in the charge to the jury on the offense of receiving stolen property in that the charge improperly defined the type of knowledge required. Although appellant was acquitted of receiving stolen property, he maintains that

the incorrect charge tainted the related conspiracy charge, on which he was convicted. We need not comment on that, however, for the trial judge, upon being advised by appellant's counsel that he had given an improper definition of knowledge, corrected the charge by reading appellant's submitted point.

The judgment of sentence is affirmed.